EXHIBIT A

LAND, ASPHALT PLANT AND EQUIPMENT LEASE

Effective as of January 7, 2008

between COLLEGE POINT ASSOCIATES

as Lessor and

FLUSHING ASPHALT, LLC

as Lessee

Affecting Land, Asphalt plant and all other related equipment located at premises commonly known as College Point Boulevard, in The City of New York, New York.

= = = = = = = = = = = = = = = = = = = = = = = = = =

394155-2

LAND, ASPHALT PLANT AND EQUIPMENT LEASE

LEASE, made this 20th day of September, 2007 to be effective January 7, 2008, between COLLEGE POINT ASSOCIATES, LLC, a New York Liability Company with offices at 299 Duffy Avenue, Hicksville, New York, 11801 ("Lessor"), and FLUSHING ASPHALT, LLC, a New York limited liability company, having an address at 120-01 31st Avenue, Flushing New York 11354 ("Lessee").

## 1.   THE EQUIPMENT AND LEASE TERM

In consideration of the Rent hereinafter reserved and the terms, covenants and conditions set forth in this Lease to be observed and performed by Lessee, Lessor hereby demises and leases to Lessee, and Lessee hereby rents and takes from Lessor, the land designated as Section 22, Block 4377, Lot 27, Section 22, Block 4378, Lot 1, Section 22, Block 4391, Lot 13, located at College Point Blvd., College Point, Queens, New York, asphalt plant and all related equipment (the "Equipment") as set forth on Schedule A attached* hereto.  The land, improvements, asphalt plant and Equipment are sometimes referred to herein collectively as "Leased property".

TO HAVE AND TO HOLD the same unto Lessee, and the permitted successors and assigns of Lessee, upon and subject to

394155-2

all of the terms, covenants and conditions herein contained, for a term (the "Lease Term") of Twenty years, commencing on January 1, 2008 and expiring on December 31, 2027, unless the Lease Term shall sooner terminate pursuant to any of the conditional limitations or other provisions of this Lease. Notwithstanding the foregoing, this Lease shall be cancelled upon the cancellation of the Agreement of Sale dated the date hereof by and between Lessee and College Point Asphalt LLC prior to the occurrence of a closing thereunder.

## 2. RENT

Lessee covenants to pay to Lessor as a net minimum rent (the "Fixed Rent") as follows:

A.    Eight Hundred Thousand Dollars ($800,000.00) per year payable in quarterly installments of $200,000.00 for the quarter for the first Five Years; for Years six through ten commencing January 1, 2013, $920,000.00 per year payable in equal quarterly installments of $230,000.00; for Years eleven through fifteen commencing January 1, 2018, $1,058,000.00 payable in quarterly installments of $264,500.00; for Years sixteen through twenty commencing January 1, 2023 and any renewal term thereafter, $1,216,000.00 per year payable in equal quarterly installments of $304,000.00.

(a)   Renewal Option.   Lessee shall have the option by giving Lessor one year's notice in writing prior to the expiration date of this Lease, to extend the Lease for a period of additional twenty years.   Base rental shall be increased by 15% of the rent called for under the terms of the Lease at the end of the period and at the end of each five-year period during the term of the option, the rental shall be increased by an additional period of 15% for each subsequent five-year period.

(b)   Lessee shall give Lessor notice of its intent to renew one year before the expiration of the option period.   Said notice shall be given in writing, by certified mail, return receipt requested.

The Fixed Rent shall be payable in advance in equal quarterly installments on the first day of the quarter.

Lessee also covenants to pay, from time to time as provided in this Lease, as Additional Rent all other amounts and obligations which Lessee assumes or agrees to pay under this Lease.   If Lessee fails to pay any such Additional Rent, Lessor shall have all the rights, powers and remedies provided for in this Lease or at law or in equity or otherwise in the case of nonpayment of rent.

B.   All Fixed Rent and Additional Rent (collectively

hereinafter referred to as "Rent") shall be paid in such coin or currency (or, subject to collection, by good check at the office of Lessor as set forth above, or at such place and to such person as Lessor from time to time may designate.

a) Except as herein below provided, there shall be no deduction in rent permitted for any sums due to Flushing Asphalt from any sale made by Flushing Asphalt to any customer of Flushing Asphalt, owned or contracted by Carl Lizza Jr. or any Member of his family;

b) In addition, Flushing Asphalt shall not be permitted to deduct or offset any monies it may owe to East River Aggregates LLC or C.L. Asphalt Products, or their successor in interest. Any attempted deduction or offset without the written consent shall be deemed a default under the terms of the lease and shall be considered to be a breach of a substantial obligation of the tenancy.

c) In the event that any amount due to Lessee from Intercounty Paving Associates LLC ("Intercounty") shall be more than 90 days past due (i.e. from the date of the original invoice), Lessee shall not be held in default of this lease for its failure to pay any obligation due from Lessee to East River Aggregates (for stone products) or CL Asphalt Products (for oil purchase) but only to the extent of any monies due from Intercounty to Lessee beyond

90 days.  Nothing herein contained shall permit Lessee to withhold payments to CL or East River for any sums in excess of the sum due from Intercounty to Lessee over 90 days.

(i)  In the event Flushing should withhold from East River and/or CL any sums in excess of the sums due to Flushing from Intercounty, such withholding shall be deemed to be a default under this Lease.

d)  <u>Additional Rent</u>:  As additional rent during each and every year during the term hereof and any renewals, the Lessor shall pay to the Lessee for account of said Lessee as additional rent all taxes, assessments or other charges of any description levied or assessed by any governmental agency or entity on or against the property in any improvements located thereon.  All taxes or assessments levied or assessed against the property during the tax year in which the term of this lease is to end shall be prorated between Lessor and Lessee on the basis of the tax year of the levying authority.  Any and all taxes, assessments, installments of tax and assessments required to be paid by the Lessor under this lease, shall be paid by the Lessor before such tax assessment or installment of tax assessment or assessment becomes delinquent, and a receipt for the payment of such tax assessment or installment shall be promptly given to the Lessee. If any tax or assessment is levied or assessed against the

property, then such tax or assessment may be paid in full or installments over a period of the within or extended beyond this lease.   Lessor shall have the option of paying such tax or assessment installments.

Any failure on the part of the Lessor to pay any additional rent shall be considered a default under the terms of this Lease and thereupon, Lessee shall have all rights, powers and remedies (including any summary dispossess proceedings and other summary remedies) now or hereafter enacted in the case of non-payment of rent.

### 3.   NO COUNTERCLAIM OR ABATEMENT

All Rent shall be absolutely net net to Lessor so that this Lease shall yield to Lessor the full amount of the installments thereof throughout the Lease Term without deduction. All Rent shall be paid to Lessor without notice, demand, counterclaim, setoff, abatement, deduction of any nature or defense, and nothing shall suspend, defer, diminish, abate or reduce any Rent, except as otherwise specifically provided in this Lease.

### 4.   USE OF EQUIPMENT

Lessee shall not do or permit any act or thing which is contrary to any Legal Requirements or Insurance Requirements, or

which might impair the value or usefulness of the Equipment or any part thereof.

Lessee shall not do or suffer any waste, damage, disfigurement or injury to the Equipment.

Lessee shall not permit the spilling, discharge, release, deposit or placement on the Demised Premises or any part thereof, whether in containers or other impoundments, of any substance which is a hazardous or toxic substance within the meaning of any applicable environmental law.

## 5.   CONDITION OF EQUIPMENT

Lessee represents that Lessee has examined and is fully familiar with the physical condition of the Land and Equipment. Lessee accepts the same, without recourse to Lessor, in the condition and state in which they now are, and agrees that the Equipment complies in all respects with all requirements of this Lease. Lessor makes no representation or warranty, express or implied in fact or by law, as to the nature or condition of the Equipment, or its fitness or availability for any particular use, or the income from or expenses of operation of the Equipment, except that Lessor represents and warrants that it owns, and at all times during the term of this Lease it shall own, the Equipment.

## 6.   MAINTENANCE AND REPAIR

Lessee, at all times during the Lease Term and at Lessee's expense, shall keep the Equipment, and all Improvements now or hereafter located thereon, in a good and clean order and condition and in such condition as may be required by all Legal Requirements and Insurance Requirements, and promptly shall make all necessary or appropriate repairs, replacements and renewals thereof, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, or foreseen or unforeseen. All repairs, replacements and renewals shall be equal in quality and class to the original work. Lessee waives any right created by any law now or hereafter in force to make repairs to the Equipment at Lessor's expense.

## 7.   ALTERATIONS AND ADDITIONS

If not in default under this Lease, Lessee at Lessee's expense may make reasonable alterations of and additions to the Equipment, provided that any alteration or addition: "shall not change the general character of the Equipment, or reduce the fair market value thereof below its value immediately before such alteration or addition, or impair the usefulness of the Equipment; is effected with due diligence, in a good and workmanlike manner and in compliance with all Legal Requirements and Insurance Requirements; and is promptly and fully paid for by

Lessee.

The title to all additions, repairs and replacements to any Improvements made during the Lease Term and any renewal thereof, forthwith shall vest in Lessor, and said Improvements, additions, repairs and replacements shall be and become the sole and absolute property of Lessor, without any obligation of payment by Lessor therefor.

## 8. COMPLIANCE WITH REQUIREMENTS

Lessee, at all times during the Lease Term and at Lessee's expense, promptly and diligently shall: comply with all Legal Requirements and Insurance Requirements, whether or not compliance therewith shall require structural changes in the Improvements or interfere with the use and enjoyment of the Equipment or any part thereof; and procure, maintain and comply with all permits, licenses, franchises and other authorizations required for any use of the Equipment or any part thereof then being made, including without limitation all permits, licenses, and franchises which Lessee is required to obtain for the proper erection, installation, operation or maintenance of the Improvements or Lessee's Equipment or any part thereof.

From time to time at the request of Lessor, Lessee at Lessee's expense shall execute, file and record such certificates of compliance, continuation statements, and other documents and certificates, and shall pay such fees and comply with such laws and regulations, as are necessary or appropriate to preserve and protect any right of Lessor under this Lease.

## 9.   LIENS

If, in connection with any work being performed by or for Lessee or any subtenant or in connection with any materials being furnished to Lessee or any subtenant, any mechanic's lien or other lien or charge shall be filed or made against the Demised Premises or any part thereof, or if any such lien or charge shall be filed or made against Lessor, then Lessee, at Lessee's expense, within thirty days after such lien or charge shall have been filed or made, shall cause the same to be canceled and discharged of record by payment thereof or filing a bond or otherwise.  Lessee promptly and diligently shall defend any suit, action or proceeding which may be brought for the enforcement of such lien or charge; shall satisfy and discharge any judgment entered therein within thirty days from the entering of such judgment by payment thereof or filing a bond or otherwise; and on demand shall pay all damages, costs and

expenses, including reasonable attorneys' fees, suffered or incurred by Lessor in connection therewith.

Nothing contained in this Lease shall constitute any consent or request by Lessor, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Equipment or any part thereof, nor as giving Lessee any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in any fashion that would permit the filing or making of any lien or claim against Lessor or the Equipment.

## 10.    UTILITY SERVICES

Lessee shall pay all charges for all public or private utility services and all sprinkler systems and protection services at any time rendered to or in connection with the Equipment or any part thereof; shall comply with all contracts relating to any such services; and shall do all other things required for the maintenance and continuance of all such services.

## 11.    INSURANCE

Lessee, at all times during the Lease Term and at Lessee's expense, shall provide and maintain in full force and

effect with insurers approved by Lessor:    (a) insurance with respect to the Improvements against loss or damage by fire, lightning, windstorm, hail, explosion, riot, riot attending strike, civil commotion, aircraft, vehicles, smoke and other risks from time to time included under "extended coverage" policies, in an amount equal to at least 100% of the full replacement value of the Equipment, and in any event in an amount sufficient to prevent Lessor or Lessee from becoming a coinsurer of any loss under applicable policies, which shall be written on a replacement cost basis, (b) public liability and property damage insurance protecting Lessor against any and all liability occasioned by negligence, occurrence, accident or disaster in or about the Equipment or any part thereof, or the Improvements now or hereafter erected thereon,    in the following amounts, in the case of public liability,$1,000,000 per person and $1,000,000 per accident, and in the case of property damage, $1,000,000; (c) explosion insurance in respect of any steam and pressure boilers and similar apparatus located on the Demised Premises in the amount of $_____; (d) war risk insurance when and to the extent obtainable from the Federal government or any agency thereof; (e) appropriate workers' compensation or other insurance against liability arising from claims of workers in respect of and during the period of any work on or about the Demised Premises; and    (f) insurance against such other hazards

and in such amounts as is customarily carried by prudent owners and operators of similar properties, and as Lessor reasonably may request. Lessee shall comply with such other requirements as Lessor from time to time reasonably may request for the protection by insurance of Lessor's interests.

All insurance maintained by Lessee pursuant to this Article 13: (a) shall, except for workers' compensation insurance, name Lessor and Lessee as insureds, as their respective interests may appear, and shall include an effective waiver by the issuer of all rights of subrogation against any named insured or such insured's interest in the Equipment or any income derived therefrom; (b) shall provide that all insurance claims for losses of less than $50,000 shall be adjusted by Lessee, and all insurance claims for losses of such amount or more, except for workers' compensation insurance which shall be adjusted by Lessee, shall be adjusted by Lessor and Lessee jointly; (c) shall provide, except in the case of public liability and workers' compensation insurance, that insurance proceeds shall be payable to Lessor or Lessee, as their respective interests may appear; (d) shall provide that any losses shall be payable notwithstanding any act or failure to act or negligence of Lessor or Lessee or any other person; (e) shall provide that no cancellation, reduction in amount or

material change in coverage thereof shall be effective until at least ten days after receipt by Lessor and Lessee of written notice thereof; and (f) shall be satisfactory in all other respects to Lessor acting reasonably.

Upon the execution of this Lease and thereafter not less than fifteen days prior to the expiration date of any policy delivered pursuant to this Article 11 Lessee shall deliver to Lessor the originals of all policies or renewal policies, as the case may be, required by this Lease, bearing notations evidencing the payment of the premiums therefor.

If at any time Lessee shall neglect or fail to provide or maintain insurance or to deliver insurance policies in accordance with this Article 11 Lessor may effect such insurance as agent for Lessee, by taking out policies in companies selected by Lessor, and the amount of the premiums paid for such insurance shall be paid by Lessee to Lessor on demand.

(a) So long as the rates are competitive, Lessee shall insure through Lessor's agent, all of the above-referenced insurance maintained by College Point Asphalt, LLC, and College Point Asphalt, LLC, which shall be amended so as to include as a named insured Flushing Asphalt, LLC. Premiums shall be allocated on the general liability portion of the policy predicated upon the volume of business performed by Flushing Asphalt, LLC,

394155.2                                    15

proportioned to that of all other entities covered under the policy. Workmen's compensation shall be calculated just based upon the salaries of the employees of Flushing Asphalt LLC. Equipment floater shall be apportioned in accordance with appropriate values and excess liability is to be apportioned and proportioned to the premium based upon the entire policy.

## 12. INDEMNIFICATION BY LESSEE

Lessee shall indemnify and hold Lessor harmless from and against all liabilities, obligations, claims, damages, fines, penalties, interest, causes of action, costs and expenses, including attorneys' fees (but excluding any income or excess profits or franchise taxes of Lessor determined on the basis of general income or revenue or any interest or penalties in respect thereof), imposed upon or incurred by or asserted against Lessor or the Demised Premises by reason of the occurrence after the commencement date of this Lease of any accident, injury to or death of persons (including workers) or loss of or damage to property occurring, or claimed to have occurred, on or about the Equipment or any part thereof, or any Improvements now or hereafter erected thereon, any use or condition of the Equipment or any part thereof, or any Improvements now or hereafter erect thereon, any failure on the part of Lessee promptly and fully to comply with or perform any of the terms, covenants or

conditions of this Lease;    or performance of any labor or services or the   furnishing of any materials   or other property in respect of the Equipment or any part thereof.

In the case any suit, action or proceeding is brought against Lessor or filed against the Equipment or any part thereof by reason of any such occurrence, Lessee, upon Lessor's request and at Lessee's expense, shall resist and defend such suit, action or proceeding, or cause the same to be resisted and defended by counsel designated by Lessee and approved by Lessor.

13.   DAMAGE TO OR DESTRUCTION OF THE EQUIPMENT

If   there   is   any   damage   to   or   destruction   of   the Equipment or any part thereof, Lessee promptly shall give written notice thereof to Lessor, generally describing the nature and extent of such damage or destruction.

If there is any damage to or destruction of the Demised Premises or any part thereof, Lessee, at Lessee's expense whether or not the insurance proceeds, if any, on account of such damage or destruction shall be sufficient for the purpose, promptly shall commence and complete, subject to Unavoidable Delays, the restoration, replacement or rebuilding of the Equipment as nearly as possible to its value, condition and character immediately prior to such damage or destruction, with such alterations and

additions as may be made at Lessee's election pursuant to and subject to the terms, covenants and conditions of Article 7. Pending the completion of such Restoration, Lessee shall perform all temporary work and take all such actions as may be necessary or desirable to protect and preserve the Equipment.

Insurance proceeds received by Lessor on account of any damage to or destruction of the Leased Property or any part thereof, less the costs and expenses incurred by Lessor or Lessee in the collection thereof, including without limitation fees and expenses of adjusters and attorneys, shall be applied as hereinafter provided.

Net insurance proceeds received on account of any damage to or destruction of the Leased Property or any part thereof, unless Lessee is in default under this Lease, shall be paid to Lessee or as Lessee may direct, from time to time as Restoration progresses, to pay or to reimburse Lessee for the cost of Restoration, upon written request of Lessee accompanied by evidence, satisfactory to Lessor that the amount requested has been paid or is then due and payable and is properly a part of such cost, that there are no mechanics' or similar liens for labor or materials theretofore supplied in connection with the Restoration, and that the balance of said proceeds after making the payment requested will be sufficient

to pay the balance of the cost of Restoration. Upon receipt by Lessor of evidence satisfactory to Lessor that the Restoration has been completed and the cost thereof has been paid in full, and that there are no mechanics' or similar liens for labor or materials supplied in connection therewith, the balance, if any, of such proceeds, unless Lessee is in default under this Lease, shall be paid to Lessee or as Lessee may direct. If Lessee is in default under this Lease, the net insurance proceeds shall be used first to cure such default under this Lease if susceptible to being so used, and the balance as provided herein.

### 14. EVENTS OF DEFAULT AND TERMINATION

If any one or more of the following events ("Events of Default") shall occur:

(a)  if Lessee shall fail to pay any Fixed Rent when as the same becomes due and payable and shall fail to cure the same within five days; or

(b)  if Lessee shall fail to pay any Rent, other than Fixed Rent, when and as the same becomes due and payable and such failure shall continue for more than ten days; or

19

(c)  if  Lessee  shall  fail  to  comply  with  or perform  any  other  term,  covenant  or  condition hereof,  and  such  failure  shall  continue  for  more than  thirty  days  after  notice  thereof  from  Lessor, and    Lessee    within    said    period,    subject    to Unavoidable  Delays,  shall  not  commence  with  due diligence  and  dispatch  the  curing  of  such  default, or,  having  so  commenced,  thereafter  shall  fail  or neglect    to    prosecute    or    complete    with    due diligence  and  dispatch  the  curing  of  such  default for  reasons  other  than  Unavoidable  Delays;  or

(d)  if  lessee  shall  fail  to  pay  East  River Aggregates  LLC  and/or  CL  Asphalt  Products  for purchases  made  by  Flushing  Asphalt,  LLC,  except as    provided    in    paragraph    2-B(c)    of    this Agreement.

(i)  Any  dispute  submitted  in  writing  to Flushing  by  a  customer  of  Flushing  involving either  stone  or  oil  shall  be  forwarded  within  24 hours  of  receipt  by  Flushing  to  Carl  Lizza  Jr. or  East  River  (as  is  appropriate),  shall  not  be deemed  a  default  under  this  provision,  only  to the    extent    of    the    amount    of    the    particular

purchase by Flushing and provided that such dispute must be rectified and resolved by Flushing within 90 days from receipt of said notice by Flushing. In the event the dispute is not resolved by Flushing with its customer within said 90 day period, its failure to make payment to Carl Lizza Jr. or East River of said disputed amount by the end of such 90 day period shall be deemed a default.

THEN, and in any such Event of Default, regardless of the pendency of any proceeding which has or might have the effect of preventing Lessee from complying with the terms, covenants or conditions of this Lease, Lessor, at any time thereafter may give a written termination notice to Lessee, and on the date specified in such notice this Lease shall terminate and, the Lease Term shall expire and terminate by limitation, and all rights of Lessee under this Lease shall cease, unless before such date (i) all arrears of Rent and all costs and expenses, including reasonable attorneys' fees, incurred by or on behalf of Lessor hereunder, shall have been paid by Lessee, and (ii) all other defaults at the time existing under this Lease shall have been fully remedied to the satisfaction of Lessor. Lessee shall reimburse Lessor for all costs and expenses, including

reasonable attorneys' fees, incurred by or on behalf of Lessor occasioned by or in connection with any default by Lessee under this Lease.

(i) Other than as provided hereinabove, and other than payment of rent and/or additional rent or taxes, Lessee shall have a period of 10 days after receipt of said termination notice to cure any such default.

### 15. OPTION

During the first five years of said Lease, Carl Lizza Jr., acting on behalf of College Point Associates, as Landlord shall have the absolute right to sell or lease the subject property to an independent unrelated third party (a "Third Party Transaction") and contingent upon closing of said Third Party Transaction, to cancel the subject lease upon at least 180 days' prior written notice to Lessee, without penalty. Landlord's right under the preceding sentence shall terminate upon the earlier to occur of the death of Carl Lizza, Jr. or at 5:00 pm on December 31, 2012.

A. In the event College Point Associates shall sell the property, James Horan shall receive 20% of the net purchase price of the sale after deducting from said purchase price the sum of $4,000,000. The "net purchase price" shall not be reduced by the

amount of any mortgage or other lien paid out of the closing proceeds; the "net purchase price" shall be increased by the amount of any mortgage or other lien paid or assumed by the purchaser of the property.

Said sum shall be paid to Horan in the same proportion as payments are received by College Point Associates.

B.    In the event College Point Associates shall elect to lease said property to a third party, College Point Associates shall have the absolute right to lease said property in a Third Party Transaction and, contingent upon closing of said Third Party Transaction, to cancel this lease upon at least 180 days' prior written notice to Lessee.   In such event, Horan shall receive 20% of the rental received by College Point Associates, after deducting from said rental income a sum equal to the rental income attributable to Carl Lizza Jr.'s $4,000,000 equity in the property, capitalized at the rate of 10%.

In the event the Leased Property has not been sold by the end of the ninth year of said lease, Horan and College Point Associates agree to obtain an independent appraisal of said property which shall be completed prior to the end of the ninth year of the term of this lease.   Horan shall have the option to purchase the Leased Property free and clear of all liens, claims and encumbrances, for a sum equivalent to 80% of the appraised

value after deducting the sum of $4,000,000 from said appraisal.

(i)  If the parties are unable to agree upon an appraiser, each party shall, at the sole cost and expense of each of the parties, appoint an appraiser for the property; and in the event the two appraisers are then unable to agree upon a value, the value shall be determined by taking the average of both appraisals which sum shall be binding upon the parties.

16.  OPTION TO RECOVER A PORTION OF THE PROPERTY

During the first 10 years of the Lease term or until the death of Carl Lizza, Jr., whichever occurs first, Landlord, acting solely by Carl Lizza Jr., shall have the option by giving tenant 90-days notice to take back and recover from the tenant up to four acres of the subject premises provided that the property taken back by the Landlord does not materially interfere with the operation of the asphalt plant operated by the Tenant.

(a)  The aforesaid four acres shall be contiguous to each other and have access to the Flushing River and 31st Avenue.

(i) In the event the Landlord shall exercise that option, all rent and taxes shall be proportionately reduced in accordance with the percentage of the portion of the subject premises taken back by the Landlord from the Tenant, as demised premises.

(ii)    In the event the Landlord shall exercise its option to take back and recover the acreage as provided herein, the option price by Horan to purchase shall be reduced by the proportion that the acreage taken back bears the total arceage of the demised premises.

### 17.    SURVIVAL OF LESSEE'S OBLIGATIONS AND DAMAGES

In the event of termination of this Lease pursuant to Section 14 hereof, Lessee shall pay to Lessor all Rent up to the time of such termination, together with all costs and expenses incurred by Lessor in connection with such termination, including attorneys' fees, and thereafter Lessee, until the end of what would have been the Lease Term in the absence of such termination and whether or not the Equipment or any part thereof shall have been relet, shall be liable to Lessor for, and shall pay to Lessor, as liquidated and agreed and current damages for Lessee's default, (a) all Rent which would be payable under this Lease by Lessee in the absence of such termination, less (b) all net rents collected by Lessor from the tenants or subtenants of the Leased Property, if any, and the net proceeds, and other sums owed Lessor,    including without limitation all repossession costs, brokerage   commissions,   legal   and     accounting   expenses, attorneys'   fees,    employees' expenses, promotional expenses, reasonable alteration costs,   and expenses of preparation for

such reletting.  Lessee shall pay such current damages monthly on the Rent Payment Dates applicable in the absence of such expiration, termination or repossession, and Lessor shall be entitled to recover the same from Lessee on each such date.

At any time after such termination, whether or not Lessor shall have collected any current damages as aforesaid, Lessor shall be entitled to recover from Lessee, and Lessee shall pay to Lessor on demand, as and for liquidated and agreed final damages for Lessee's default and in lieu of all current damages beyond the date of such demand, an amount equal to the excess, if any, of (a) all Rent which would be payable under this Lease from the date of such demand (or, if it be earlier, the date to which Lessee shall have satisfied in full Lessee's obligation under the preceding paragraph of this Article 17 to pay current damages) until what would be the then unexpired Lease Term in the absence of such expiration, termination or repossession, over (b) the then fair net rental value of the Leased Property for the same period.  Upon the payment of such final damages, this Lease, if not already terminated, shall be deemed terminated.  If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Lessor shall be entitled to the maximum amount allowable under such statute or rule of law.

## 18.  WAIVERS

To the extent permitted by law, Lessee waives: any notice of reentry or of the institution of legal proceedings to that end; any right of redemption, reentry or repossession; any right to trial by jury in any action or proceeding or in any matter in any way connected with this Lease or the Demised Premises; and the benefit of any laws now or hereafter in force exempting property for rent or for debt.

No failure by Lessor or Lessee to insist upon the strict performance of and compliance with any term, covenant or condition hereof or to exercise or enforce any right, power or remedy consequent upon a breach thereof, and no submission by Lessee or acceptance by Lessor of full or partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of any such term, covenant or condition.  No waiver of any breach of any term, covenant or condition of this Lease shall affect or alter this Lease, which shall continue in full force and effect, or the respective rights, powers or remedies of Lessor or Lessee with respect to any other then existing or subsequent breach.

19.   LESSOR'S REMEDIES CUMULATIVE

All of the rights, powers and remedies of Lessor provided for in this Lease or now or hereafter existing at law or in equity, or by statute or otherwise, shall be deemed to be separate, distinct, cumulative and concurrent. No one or more of such rights, powers or remedies, nor any mention of reference to any one or more of them in this Lease, shall be deemed to be in the exclusion of, or a waiver of, any other rights, powers or remedies provided for in this Lease, or now or hereafter existing at law or in equity, or by statute or otherwise. The exercise or enforcement by Lessor of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise or enforcement by Lessor of any or all of such other rights, powers or remedies.

20.   ENTRY BY LESSOR

Lessor and the authorized representatives of Lessor shall have the right to inspect the Equipment upon reasonable advance notice to Lessee and during regular business hours for the purpose of inspecting the same or for the purpose of doing any work permitted to be done by Lessor under this Lease, and to take all such actions thereon as may be necessary or appropriate

for any other purpose. Nothing contained in this Lease shall create or imply any duty on the part of Lessor to make any such inspection or do any such act. Lessor and representatives of Lessor shall have the right, upon reasonable advance notice to Lessee and during regular business hours to show the Equipment at all reasonable times for the purpose of showing the Equipment to (i) prospective purchasers or mortgagees, and (ii) during the twelve month period preceding the expiration or termination of this Lease, to prospective tenants, and within said period to display on the Equipment advertisements for sale or letting if such advertisements do not interfere with the business then conducted by the Lessee. No such entry shall constitute an eviction of Lessee.

### 21. ACCEPTANCE OF SURRENDER

No modification, termination or surrender of this Lease or surrender of the Equipment or any part thereof or of any interest therein by Lessee shall be valid or effective unless agreed to and accepted in writing by Lessor, and no act by any representative or agent of Lessor, other than such a written agreement and acceptance, shall constitute an acceptance thereof.

### 22. END OF LEASE TERM

Upon the expiration or termination of the Lease Term,

Lessee shall quit, surrender and deliver to Lessor the Equipment with the Improvements thereon in good order and condition, ordinary wear and tear excepted, and shall remove all Lessee's Equipment therefrom.

## 23.  DEFINITIONS

As used in this Lease, the following terms have the following respective meanings:

"default" -- any condition or event which constitutes, or which after notice or lapse of time or both would constitute, an Event of Default.

"Insurance Requirements" -- all terms of any insurance policy covering or applicable to the Demised Premises or any part thereof, all requirements of the issuer of any such policy, and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters, or its successor or any other body exercising similar functions, applicable to or affecting the Demised Premises or any part thereof or any use or condition of the Demised Premises or any part thereof.

"Lease" -- this Lease, as at the time amended, modified or supplemented.

"Lease Term" --as defined in Article 1, as the same may be extended or renewed.

"Legal Requirements" -- all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments, departments, commissions, boards,' courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Demised Premises or any part thereof, or the Improvements now or hereafter located thereon, or the facilities or equipment therein, or any of the adjoining sidewalks, curbs, vaults or vault space, if any, streets or ways, or the appurtenances to the Demised Premises or the franchises and privileges connected therewith, or any use or condition of the Demised Premises or any part thereof. Legal Requirements shall include the Comprehensive Environmental Response Compensation

and Liability Act, 42 U.S.C. Section 9601 et seq.,
the Resource Conservation and Recovery Act, 42
U.S.C. Section 6901 et seq., and all other
applicable environmental laws and regulations, and
all requirements to be complied with pursuant to
any certificate of occupancy affecting the Demised
Premises.

"Lessee's Equipment" -- all fixtures, machinery,
apparatus, furniture, furnishings and other
equipment and all temporary or auxiliary
structures installed by or at the" request of
Lessee in or about .the Demised Premises or any
part thereof, which are removable without damage
to the Demised Premises.

"person" --an individual, a corporation, an
association, a partnership, a joint venture, an
organization, or other business entity, or a
governmental or political unit or agency.

"Rent Payment Date" -- as defined in Article 2.

"Restoration" -- all restorations, replacements,
rebuildings, alterations, additions, temporary
repairs and property protection to be performed in

connection with a Taking of the Leased Property or the damage to or destruction of the Leased Property.

"Unavoidable Delays" -- delays due to acts of God, governmental restrictions, enemy action, riot, civil commotion, fire, unavoidable casualty or other causes beyond the control of Lessee, provided that no delay shall be deemed an Unavoidable Delay if the Demised Premises or any part thereof or interest therein or any Rent would be in any danger of being sold, forfeited, lost or interfered with, or if Lessor or Lessee would be in danger of incurring any civil or criminal liability for failure to perform the required act. Lack of funds shall not be deemed a cause beyond the control of Lessee.

## 24. NOTICES

All notices, demands, elections and other communications desired or required to be delivered or given under this Lease shall be in writing, and shall be deemed to have been delivered and given, on the third business day after the same have been mailed by first class registered or certified mail, postage prepaid, or on the next business day if sent for next

day delivery by Federal Express or other recognized overnight courier; in each case, if enclosed in a securely sealed envelope addressed to the party which the same is to be delivered or given at such party's address as set forth in this Lease or at such other address as said, party shall have designated in writing in accordance with this Article.

## 25. ASPHALT CEMENT PURCHASE PROVISIONS

(a)   During the term of this agreement, Lessee agrees to purchase from CL Asphalt Products, 100% of the Lessee's requirement for asphalt cement, provided that the asphalt cement is of the types and meets all specifications required by the City of New York; the State of New York; the Port Authority of the States of New York and New Jersey; and/or any other governmental authority purchasing finished asphalt products from the Lessee, and further provided that CL Asphalt Products is able to timely supply Lessee's requirements.   Prices, terms and conditions shall be as set for the herein below.

(b)   The price to be paid for said asphalt cement purchased by the Lessee under this subparagraph shall be at or below the best price available to purchasers of asphalt cement at asphalt plants located along the Flushing River to the preceding sentence, the price shall be determined at the sole discretion of CL Asphalt Products in accordance with the terms set forth

394155.2                                                            34

herein.   The Lessee shall pay the purchase price for said asphalt cement under this agreement within ninety (90) days from the end of the calendar month in which the aforesaid asphalt cement is delivered.

(c)   Failure by the Lessee to meet the terms and conditions of this Asphalt Purchase Agreement shall constitute a default under this lease and shall permit Lessor to avail themselves of any remedies permitted under the terms of this lease.

(d)   The provisions of this Asphalt Purchase Agreement shall be for twenty (20) years, and shall survive the Lessee's option to purchase and/or the cancellation of the lease as provided in this agreement but solely if Lessee continues the operations of the asphalt business theretofore conducted at the Leased Property within the Five Boroughs of New York City.

## 26. STONE PRODUCTS PURCHASE AGREEMENT

(a) During the term of this agreement, Lessee shall purchase from East River Aggregates, LLC.  East River Aggregates, LLC agrees to sell to Lessee 100% of Lessee's requirements for stone products at the prices upon the terms and conditions set forth herein.   Notwithstanding the foregoing, Lessee shall be free to purchase its requirements of "yellow sand" and recycled

asphalt products from other suppliers, without obligation to East River Aggregates LLC hereunder. The stone products to be purchased will be in proportion to the corresponding products necessary to the asphalt mix requirement required by the City of New York; the State of New York; the Port Authority of New York and New Jersey; and any other governmental authority purchasing finished asphalt products from the Lessee.

(b) If for any reason the Lessee is unable to obtain 100% of its requirements for stone products from East River Aggregates, LLC, then the Lessee shall be entitled to purchase such requirements from a third party or third parties without recourse to East River Aggregates, LLC for any additional cost.

(c) The price to be paid by Flushing Asphalt for said stone products under this subparagraph shall be the cost computed as follows: total cost from Flushing Asphalt shall be the cost that East River Aggregates LLC shall pay to Telcon, plus trucking costs, plus $4.00 per ton, but in no event is the aforesaid price to exceed the best price for comparable stone as sold/purchased to exceed the price to Asphalt Plants located along the Flushing River. The Lessee shall pay the purchase price for said stone products under this agreement within sixty (60) days from the end of the calendar month in which the aforesaid stone products are delivered.

(d)    Failure by the Lessee to pay for said products and comply with the terms and conditions of this Stone Products Purchase Agreement shall constitute a default under this lease and shall permit Lessor to avail themselves of any remedies permitted under the terms of this lease.

(e)    The provisions of this Stone Products Purchase Agreement shall be for twenty (20) years, and shall survive the Lessee's option to purchase and/or the cancellation of the lease as provided in this agreement but solely if Lessee continues the operations of the asphalt business theretofore conducted at the Leased Property within the Five Boroughs of New York City.

## 27.    MISCELLANEOUS

All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Lease invalid, unenforceable or not entitled to be recorded under any applicable law.    If any term, covenant or condition of this Lease shall be held to be invalid, illegal, or unenforceable, the validity of the other terms, covenants and conditions of this Lease shall in no way be affected thereby.    This Lease, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

The headings in this Lease are for purposes of reference only and shall not limit or define the meaning hereof. This Lease may be changed or modified only by an instrument in writing signed by the party against which enforcement of such change or modification is sought.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease on the date first above written.

COLLEGE POINT ASSOCIATES LLC

By _____
    Carl Lizza, Jr.
    Managing Member

FLUSHING ASPHALT, LLC

By _____
    James A. Horan
    Managing Member

394155.2                          38

EXHIBIT B

James A. Horan
5 Colleen Court
Rockaway, New Jersey 07866

January 14, 2016

VIA CERTIFIED MAIL, RRR, AND FEDERAL EXPRESS

College Point Associates, LLC
299 Duffy Avenue
Hicksville, New York 11801

Re: Exercise of Option to Purchase Property

Dear Sir/Madam,

Reference is made to that certain Land, Asphalt Plant and Equipment Lease (the "Lease") dated September 7, 2007 between College Point Associates, LLC ("Landlord") and Flushing Asphalt, LLC ("Tenant"). Terms defined in the Lease shall have the same meaning when used herein, unless the context otherwise requires.

Please be advised that I do hereby exercise my option to purchase the Leased Property pursuant to Section 15 of the Lease. As you know, Section 15 requires that an independent appraisal of the Leased Property be obtained for purposes of determining the purchase price for the Leased Property. I therefore request that, within 30 days from the date of this letter, you identify at least one qualified independent appraiser whom you would suggest to be engaged to prepare the appraisal. In this way, I hope that we can amicably agree upon a mutually acceptable appraiser, thereby saving the time and cost of obtaining multiple appraisals for the property.

I look forward to hearing from you.

Sincerely,

James A. Horan

cc: Lorraine Rose
Viane Lizza
James T. Burns, Eugene J. Porfido and Kenneth M. Scheriff, as co-Personal Representatives of the Estate of Carl Lizza, Jr.

(All cc's via Federal Express)

55595

# EXHIBIT C

James A. Horan
5 Colleen Court
Rockaway, New Jersey 07866

December 19, 2016

VIA FEDERAL EXPRESS

College Point Associates, LLC
299 Duffy Avenue
Hicksville, New York 11801
Attention: Lorraine Rose, Managing Member

Re: Exercise of Option to Purchase the Leased Property pursuant to certain Land, Asphalt Plant and Equipment Lease (the "Lease") dated September 7, 2007 between College Point Associates, LLC ("Landlord") and Flushing Asphalt, LLC ("Tenant").

Dear Lorraine,

As you know, by letter dated January 14, 2016, I exercised my option to purchase the Leased Property (as such term is defined in the Lease). We have since had discussions and additional correspondence regarding my purchasing the Leased Property as of the end of the 9th year of the Lease, as is my right under the Lease. We have also exchanged appraisals in accordance with the terms of the Lease.

I hereby reiterate that I have exercised my option to purchase the Leased Property at the purchase price calculated below in accordance with §15 of the Lease.

Based upon the appraisals prepared by our respective appraisers, Goodman-Marks Associates, Inc. ($25,840,000.00)[1] and Withers Engelke & Associates, Inc. ($13,060,000.00), the purchase price for the Leased Property is **$12,360,000.00**, which was calculated in accordance with §15 of the Lease, as follows:

    (a) Take the average of the 2 appraisals:

$25,840,000 + $13,060,000 = $38,900,000 / 2 = $19,450,000

    (b) Subtract $4 million from (a) above = $15,450,000

    (c) Purchase price is 80% of (b) above = $12,360,000.

---

[1] As discussed at our meeting on December 13, 2016, the alternative value provided by your appraiser is irrelevant since it fails to take into consideration the fact that the Leased Property is subject to a long term lease, as required by Court decisions in New York, including the 2008 Court of Appeals decision in the case entitled *936 Second Ave. L.P. v. Second Corporate Dev. Co. Inc.* 10 N.Y.3d 628, a copy of which case was delivered to you and your counsel at our December 13 meeting. I also note that neither appraisal takes into account potential environmental liens and/or clean up costs which potentially could substantially lower the appraised value of the Leased Property. In the event a Phase I study of the Leased Property reveals environmental issues which require additional investigation and/or remediation, the purchase price for the Leased Property would have to be appropriately reduced.

Please be advised that I am prepared to close the transaction during the month of January 2017. Please have your counsel contact my counsel promptly to effectuate the closing at the purchase price set forth above.

Sincerely,

James A. Horan

cc: Viane Lizza
    James T. Burns, Eugene J. Porfido and Kenneth M. Scheriff, as co-Personal Representatives of the Estate of Carl Lizza, Jr.
    Jonathan L. Goldstein, Esq.

(All cc's via Federal Express)

2

135957