NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES A. HORAN,<br><br>*Plaintiff*,<br>v.<br><br>COLLEGE POINT ASSOCIATES, LLC,<br><br>*Defendant*. | Civil No. 2:17-cv-00771 (KSH) (CLW)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Before the Court is a motion for summary judgment brought by plaintiff, James A. Horan, who seeks to enforce a purchase option (the "Option") contained in the Land, Asphalt Plant and Equipment Lease (the "Lease") between defendant-landlord College Point Associates, LLC and tenant Flushing Asphalt LLC. The Option, he argues, entitles him to buy a parcel of real property owned by College Point located in Queens, New York at the amount calculated using a pricing formula set forth in the Lease. The motion is fully briefed (D.E. 80, 83, 84) and the Court decides it without oral argument. *See* L. Civ. R. 78.1.

I.  **Background**

Unless otherwise noted, the following relevant facts are undisputed. Carl Lizza, Jr. was involved in the asphalt business for many years and had holdings throughout the industry. (D.E. 79, Stipulation of Facts, ¶ 7.) Since 1978, Horan worked for and

1

with Lizza and his affiliated companies, including College Point and Flushing Asphalt. (*Id.*)

On September 20, 2007, College Point and Flushing Asphalt entered into the Lease, which concerned property identified on the tax maps of New York City as Block 4377, Lot 27; Block 4378, Lot 1; and Block 4391, Lot 13 (the "Property"). (*Id.* ¶¶ 2-3.) At that time, Lizza owned and operated College Point with his sister, Lorraine Rose. (D.E. 80-9, Pl.'s 56.1 Stmt., ¶ 46.) Horan co-owned Flushing Asphalt with Lizza's wife, Viane, and Lizza's sister, Lorraine, with Horan as its managing member. (Stipulation of Facts at ¶¶ 5-6.)

Pursuant to the Lease, Flushing Asphalt rented the Property from College Point for a term of 20 years beginning January 1, 2008, with the right to renew the Lease for a second 20-year term. (Stipulation of Facts at ¶ 4.) The focus of this lawsuit surrounds the Option, appearing within paragraph 15 of the Lease:

> 15. OPTION. During the first five years of said Lease, Carl Lizza Jr., acting on behalf of College Point Associates, as Landlord shall have the absolute right to sell or lease the subject property to an independent unrelated third party (a "Third Party Transaction") and contingent upon closing of said Third Party Transaction, to cancel the subject lease upon at least 180 days' prior written notice to Lessee, without penalty. Landlord's right under the preceding sentence shall terminate upon the earlier to occur of the death of Carl Lizza, Jr. or at 5:00 pm on December 31, 2012.
>
> A. In the event College Point Associates shall sell the property, James Horan shall receive 20% of the net purchase price of the sale after deducting from said purchase price the sum of $4,000,000. The "net purchase price" shall not be reduced by the amount of any mortgage or other lien paid out of the closing proceeds; the "net purchase price" shall

be increased by the amount of any mortgage or other lien paid or assumed by the purchaser of the property.

Said sum shall be paid to Horan in the same proportion as payments received by College Point Associates.

B. In the event College Point Associates shall elect to lease said property to a third party, College Point Associates shall have the absolute right to lease said property in a Third Party Transaction and, contingent upon closing of said Third Party Transaction, to cancel this lease upon at least 180 days' prior written notice to Lessee. In such event, Horan shall receive 20% of the rental received by College Point Associates, after deducting from said rental income a sum equal to the rental income attributable to Carl Lizza Jr.'s $4,000,000 equity in the property, capitalized at the rate of 10%.

*In the event the Leased Property has not been sold by the end of the ninth year of said lease, Horan and College Point Associates agree to obtain an independent appraisal of said property which shall be completed prior to the end of the ninth year of the term of this lease. Horan shall have the option to purchase the Leased Property free and clear of all liens, claims and encumbrances, for a sum equivalent to 80% of the appraised value after deducting the sum of $4,000,000 from said appraisal.*

*(i) If the parties are unable to agree upon an appraiser, each party shall, at the sole cost and expense of each of the parties, appoint an appraiser for the property; and in the event the two appraisers are then unable to agree upon a value, the value shall be determined by taking the average of both appraisals which sum shall be binding upon the parties.*

(D.E. 80-2, Ex. A (the "Lease"), at 22-24 (emphasis added).)

In a January 14, 2016 letter to College Point, Horan "exercise[d] [his] option to purchase the Leased Property pursuant to Section 15 of the Lease." (D.E. 80-3, Ex. B.). In doing so, he requested College Point to "identify at least one qualified independent appraiser" in hopes that they could "amicably agree upon a mutually acceptable appraiser" to determine the purchase price for the Property. (*Id.*) The

3

parties, however, were unable to reach an agreement and each retained his own appraiser. (Stipulation of Facts at ¶ 9.) Horan appointed Norman Engelke of Withers Engelke & Associates, Inc., and College Point appointed Matthew Gusowski of Goodman-Marks Associates, Inc. (*Id.* ¶¶ 10, 12.) Each appraiser then evaluated the Property.

The Lease, however, did not specify whether the appraisers were to value the Property as encumbered or unencumbered by Flushing Asphalt's lease. Withers Engelke used the "income approach" and appraised the leased fee value, which resulted in a $13,060,000 market valuation. (D.E. 80-7, Ex. F.) Goodman-Marks provided two estimates: they used the "income capitalization approach" to appraise the leased fee value and the "sales comparison approach" to appraise the fee simple value, which resulted in valuations of $25,840,000 and $37,100,000, respectively. (D.E. 80-8, Ex. G.)

On December 19, 2016, Horan sent a letter to College Point reiterating his right to purchase the Property pursuant to the Option:

> Based upon the appraisals prepared by our respective appraisers, Goodman-Marks Associates, Inc. ($25,840,000.00) and Withers Engelke & Associates, Inc. ($13,060,000.00), the purchase price for the Leased Property is **$12,360,000.00**, which was calculated in accordance with §15 of the Lease, as follows:
>
> (a) Take the average of the 2 appraisals:
>
> $25,840,000 + $13,060,000 = $38,900,000 / 2 = $19,450,000
>
> (b) Subtract $4 million from (a) above = $15,450,000

4

> (c) Purchase price is 80% of (b) above = $12,360,000.
>
> Please be advised that I am prepared to close the transaction during the month of January 2017.

(D.E. 80-4, Ex. C.) With respect to the $37,100,000 valuation of the fee simple by Goodman-Marks, Horan wrote:

> As discussed at our meeting on December 13, 2016, the alternative value provided by your appraiser is irrelevant since it fails to take into consideration the fact that the Leased Property is subject to a long term lease, as required by Court decisions in New York, including the 2008 Court of Appeals decision in the case entitled *936 Second Ave. L.P. v. Second Corporate Dev. Co. Inc.*, 10 N.Y.3d 628, a copy of which case was delivered to you and your counsel[.]

(*Id.*) College Point disputes the methodology of Withers Engelke's appraisal and refuses to sell the Property to Horan for $12,360,000. (Pl.'s 56.1 Stmt., ¶ 30.)

On February 6, 2017, Horan filed a complaint against College Point to enforce his right to purchase the Property. (D.E. 1.) One month later, he filed an amended complaint. (D.E. 11.) Horan seeks to compel College Point to convey the Property ("Count One") by asking the Court to: (1) establish the calculated Option price at $12,360,000, and (2) direct College Point to transfer the Property free and clear of all encumbrances other than the Lease upon payment of that price. In the alternative, pursuant to 28 U.S.C. § 2201, Horan asks the Court to determine the rights and obligations of each party under the Option and declare that they proceed accordingly as final judgment (Count Two).

5

College Point moved to dismiss the amended complaint based on improper venue, or in the alternative, to transfer the case to the Eastern District of New York (D.E. 15), which was denied (D.E. 48). On December 22, 2017, College Point filed an answer and counterclaims. (D.E. 50.) Its first counterclaim seeks declaratory judgment that the Property is to be valued free and clear of all liens, claims, and encumbrances including the Lease. In the alternative to such unencumbered valuation, College Point asks the Court to declare that the appraisal of the Property, subject to the leasehold encumbrance, shall consider the actual fair market value of rental income based on comparable properties as well as the present value of College Point's revisionary interest upon expiration of the Lease. Its second counterclaim seeks a judgment dismissing the amended complaint, declaratory relief as stated in the first counterclaim, a declaratory judgment that Horan is not entitled to a $4,000,000 "'gift' as a 'deduction' from or reduction of the Option purchase price," and attorneys' fees. (*Id.* at 12-13.)

Declaratory judgments are sought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Under this Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

## II. Discussion

Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Here, Count One of the amended complaint seeks judgment establishing a sum certain as the option price and compelling conveyance to Horan at that price. Count Two and both counterclaims seek declaratory relief. Hence, in deciding this motion, the Court must determine if Horan, as the movant, has amassed record evidence sufficient to warrant judgment in his favor on Count One.

According to College Point, there are ambiguities in the Lease and Option that forbid such relief. The parties agree that the laws of New York govern the construction and enforcement of the Lease and Option. Under New York law, "[t]he matter of whether [a] contract is ambiguous is a question of law for the court." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y. 3d 239, 244 (2014). "[C]ontract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood

7

in the particular trade or business." *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017) (quotation marks and citation omitted). "'Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.'" *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)).

College Point argues that summary judgment is inappropriate because the Lease contains ambiguities that create material questions of fact. Those ambiguities, according to College Point, are twofold: the first concerns the $4,000,000 deduction in the pricing formula set forth in the Lease, and the second relates to how the Property should be appraised in the event the Option is exercised.

At the outset, the Court notes that the Lease references three separate $4,000,000 deductions, each appearing within paragraph 15. The first provides: "In the event College Point Associates shall sell the property, James Horan shall receive 20% of the net purchase price of the sale *after deducting from said purchase price the sum of $4,000,000*." (Lease, ¶ 15(A).) The second reference contains some context:

> In the event College Point Associates shall elect to lease said property to a third party, College Point Associates shall have the absolute right to lease said property in a Third Party Transaction and, contingent upon closing of said Third Party Transaction, to cancel this lease upon at least 180 days' prior written notice to Lessee. In such event, Horan shall receive 20% of the rental received by College Point Associates, *after deducting from said rental income a sum equal to the rental income attributable to Carl Lizza Jr.'s 4,000,000 equity in the property, capitalized at the rate of 10%.*

8

(*Id.* at ¶ 15(B).) The third and final reference provides, in pertinent part: "Horan shall have the option to purchase the Leased property free and clear of all liens, claims and encumbrances, for a sum equivalent to 80% of the appraised value *after deducting the sum of $4,000,000 from said appraisal.*" (*Id.*)

Horan argues that the third reference is "crystal clear" and that after $4,000,000 is deducted from the average of the two appraisals, he has a right to purchase the Property at a 20% discount. College Point argues that Horan's interpretation of the pricing formula ignores paragraph 15 as a whole, and asserts that the purpose of each deduction is for the return of Lizza's $4,000,000 equity in the Property. To the extent that the Option does not expressly state the intended beneficiary of the $4,000,000 deduction, College Point contends that the Option is ambiguous.

Support for College Point's position can be found in the record. Joshua Stein, an expert retained in this action by College Point, stated that Lizza held a $4,000,000 "first priority claim" on the Property, concluding that, "[i]t makes no sense to subtract $4,000,000 from the appraised value in determining the Option Price. That subtraction is fundamentally inconsistent with the allocation of value contemplated in similar Lease provisions that applied earlier in the Lease term, and the Lease when considered as a whole. Therefore, the [third] reference to $4,000,000 should be interpreted as a confused effort to recognize [Lizza's first priority claim] in the context of the Option Price." (D.E. 83-5, Ex. D ("Stein Report"), ¶¶ 34, 40.3.) Therefore, Stein posits, "given how the Lease treats [Lizza's first priority claim,] generally,

9

Optionee should be required to pay as the Option Price: (1) $4,000,000 to recognize the [first priority claim]; plus (b) 80% of appraised value above the [first priority claim]." (*Id.* at ¶ 51.)

Other individuals also understood that Lizza's $4,000,000 equity was intended to be returned. For example, Sigmund Semon – Lizza's attorney who helped draft the Lease – testified that Lizza did not intend for Horan to benefit from the $4,000,000 deduction contained in the Option, and that it was his understanding that Lizza intended to receive the return on his investment. (D.E. 83-6, Ex. E ("Semon Dep."), at 97:13-22.) Likewise, Robert Behringer, a business partner of Lizza's, recalled discussing the Option with Lizza and testified that "no matter what happened, whether [the Property] was sold to Jimmy [Horan] or [Lizza's] wife or [Lizza's] sister or a third party, that the 4 million would come back to him." (D.E. 83-7, Ex. F ("Behringer Dep."), at 71:24 – 72:2.) In short, there is a record with live witnesses expressing opinions that sorely test Horan's position that the Option is free of ambiguity.

There is also a practical issue. Horan is the plaintiff and the movant, and his position defines both the issues in dispute and his entitlement to summary judgment. As such, Horan's "that's that" contention in his motion is an ill fit with his basic premises in his moving brief, to wit:

> The Transaction put together a seamless whole. The Lease and its continuation was and is essential to Flushing Asphalt's ability to conduct business. Horan's management was and is essential to Flushing Asphalt's

10

> ability to conduct business. The Transaction as a whole was structured to assure that Horan was incentivized to join, remain with and manage Flushing Asphalt, for Flushing Asphalt to remain in business as a purchaser from Carl's and his family's other businesses, and the Lease and its Option have to be read in the ways that bring about and preserve all those essential elements.

(D.E. 80-10, Moving Br. at 4.) And:

> Considered in the light of the indisputable purposes of the Transaction, of which the Lease and Horan's Option form a part, the language of the Lease and the other Transaction documents, the rights and obligations of the parties in respect to Horan's Option are crystal clear and must be enforced so as to permit Horan to proceed with the purchase of the Leased Property at the price calculated using the pricing formula set forth in Horan's Option.

(*Id.* at 11.)

How can the Court interpret the language Horan's way without knowing about what was "essential to Flushing Asphalt's ability to conduct business"? How does the Court intuit that the transaction "as a whole" came about to "assure that Horan was incentivized" to make specific business decisions without finding facts establishing that scenario? In short, Horan argues context to prove there is no indefiniteness, which begs the question of where in the written language of the Option that context is expressed.

Along with the foregoing, the Court is not satisfied that Horan has countered College Point's opposition on the issue of the pricing formula. He relies on *Tonkery v. Martina*, 577 N.E.2d 1042 (1991) for his position that the formula is free of ambiguity and empowering the Court to compel a sale to him at $12,360,000. In a very short

11

decision, the New York Court of Appeals examined different option language in *Tonkery* and held it expressed a definite standard for calculating the sale price of real property:

> [W]e . . . hold that the option at issue here is not void for indefiniteness. The terms of the option indicate clearly that the parties both intended to commit the calculation of price to a third party and agreed to be bound by the result. The parties never agreed to agree on a purchase price in the future, but instead tied the price of the parcel to an extrinsic event – either the price offered by a bona fide purchaser or that set by appraisal – and, additionally, provided the method for selection of appraisers. We conclude that this "provides an objective standard that renders the * * * [option] definite and enforceable."

*Tonkery*, 577 N.E.2d at 1042-43 (quoting *Matter of 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 107 (1991)) (alteration in original).

There were three appraisers involved in *Tonkery* and how they were to be selected was agreed upon. Here, each side is left to its own devices in coming up with an appraiser and critically, the deduction of $4,000,000 from "said appraisal" – the appraised value set by a jointly chosen professional – is not carried over into subparagraph (i) that provides for the fallback of taking the average of each party's appraiser. (*See* Lease, at 23-24.) Whether it should be depends upon, of course, that incentivizing, seamless, fact specific context that a fuller exposition and testing of the factual background will shed light on.

The Court concludes that Horan's Option is not "crystal clear" enough for summary judgment and a swift end to the parties' dispute. Horan's motion that the

12

Court grant summary judgment in his favor on Count One of the amended complaint is denied.

In the interests of a reasoned decision about the parties' rights and obligations under the Option, the Court will require a careful lead-up to a useful presentation before it. Judge Waldor shall assist in setting parameters of trial and as a supplement/narrowing of the final pretrial order (D.E. 79), the Court directs the parties commit to a list of witnesses for each side and the estimated time each individual will testify on direct and cross examination. The Court requests that the parties include in their trial briefs a short statement about the anticipated direct testimony of each side's witnesses and how that testimony relates to relevant facts for the Court's findings. After the parties and Judge Waldor have consulted, the Court invites a joint proposed schedule of dates for in limine motions, oral argument thereon, jury selection, and continuous trial days thereafter.

## III. Conclusion

For the foregoing reasons, Horan's motion for summary judgment is denied. An appropriate order will issue.

Date: June 2, 2021

    /s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.